UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIUS DOMOKOS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SCOTTSDALE INSURANCE COMPANY,<br><br>Defendant. | Case No. 20-cv-00336-SVK<br><br>**ORDER DENYING MOTION TO DISMISS FIRST AMENDED COMPLAINT AND GRANTING REQUEST FOR JUDICIAL NOTICE**<br><br>Re: Dkt. No. 16, 17 |

This case involves claims by Plaintiffs Marius Domokos and Lex Kosowsky that Defendant Scottsdale Insurance Company wrongfully denied them coverage under a directors' and officers' ("D&O") liability insurance policy issued to Plaintiffs' former employer, Shocking Technologies, Inc. ("Shocking"), for claims brought against Plaintiffs in a pending state court action. Dkt. 14 (First Amended Complaint ("FAC")) ¶ 1. Scottsdale now seeks to dismiss the FAC pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Dkt. 16. In support of its motion to dismiss, Scottsdale also filed a request for judicial notice. Dkt. 17. The parties have consented to the jurisdiction of a magistrate judge. Dkt. 9, 12.

Pursuant to Civil Local Rule 7-1(b), the Court deems the pending motion suitable for determination without oral argument. After considering the parties' submissions, the case file, and relevant law, and for the reasons discussed below, Scottdale's request for judicial notice is **GRANTED** and Scottdale's motion to dismiss is **DENIED**.

## I. BACKGROUND

This discussion of the background facts is based on the allegations of the FAC. Plaintiff Lex Kosowsky was a founder, chief executive officer, and director of Shocking from the company's founding in 2005 until approximately May 2013. FAC ¶ 6. Plaintiff Marius Domokos was general counsel of Shocking from 2011 until approximately May 2013. *Id.* ¶ 7. Shocking was placed into involuntary Chapter 7 bankruptcy on or around March 12, 2013, and that

bankruptcy case was closed on August 22, 2013. *Id.* ¶ 8.

Beginning around 2007 and for consecutive years thereafter, Defendant issued insurance policies to Shocking, which included D&O liability coverage sections. *Id.* ¶ 13. The Business and Management Indemnity Policy issued by Defendant that became effective on December 7, 2012 (the "Policy"[1]) included a D&O liability coverage section with a $5 million limit of liability, inclusive of defense fees and costs. *Id.* ¶ 14 and Ex. A. Plaintiffs claim that Shocking's directors (including Plaintiff Kosowsky) paid the $27,415 premium for the Policy due to Shocking's financial instability at the time the Policy was issued. *Id.* ¶ 15. The Policy was a renewal of a similar policy issued to Shocking by Scottsdale for the period December 7, 2011 through December 6, 2012 (the "Prior Policy"), which also included similar D&O liability coverage. *Id.* ¶ 16. Each Plaintiff was an "Additional Insured" under the Policy and the Prior Policy as a current or former Shocking Director, Officer, and/or Employed Lawyer." *Id.* ¶ 18.

The Policy was cancelled on August 1, 2013 as a result of Shocking's bankruptcy proceedings. *Id.* ¶ 17. Effective August 1, 2013, Scottsdale issued Endorsement No. 35 to the Policy, which extended the "Discovery Period" under the Policy for three years, through August 1, 2016. *Id.* Shocking's directors (including Plaintiff Kosowsky) paid an additional premium of $41,122.50 for the extension of the Discovery Period. *Id.*

On March 23, 2015, Zurvan Mahamedi filed a civil action in Santa Clara County Superior Court, styled *Van Mahamedi v. Lex Kosowsky et al.*, Case No. 1:15-CV-278496 (the "Underlying Action"). *Id.* ¶¶ 1, 26. Mahamedi is an attorney who provided patent law advice and related legal services to Shocking, through his former law firm Mahamedi Paradice LLP and its predecessors, from 2005 to 2013. *Id.* ¶ 12. The original complaint in the Underlying Action (the "Mahamedi Complaint") alleged causes of action for deceit and negligent misrepresentation against both Plaintiffs in this action as well as Shocking investor LittleFuse, Inc. *Id.* ¶ 26 and Ex. B.[2] The Mohamedi Complaint arose from alleged statements by the defendants in that action about Shocking's financial condition and ability to pay Mahamedi's invoices. FAC ¶¶ 27-31. As of the time Plaintiffs filed the FAC in this case, the Underlying Action remained pending and Plaintiffs had incurred legal fees and other costs in excess of $100,000 in connection with their defense of

---

[1] The Policy is attached to the FAC as Exhibit A (Dkt. 14-1).
[2] The Mahamedi Complaint is attached to the FAC as Exhibit B (Dkt. 14-2).

the Underlying Action. *Id.* ¶¶ 50-51.

On April 7, 2015, Shocking's insurance agent tendered the Mohamedi Complaint to Scottsdale for defense and indemnification of Plaintiffs in the Underlying Action. *Id.* ¶ 32. By letter dated April 15, 2015, Scottsdale declined coverage on two main grounds: (1) a "Prior and Interrelated Wrongful Acts Exclusion" attached as Endorsement No. 26 to the Policy; and (2) Scottsdale's determination that Mahamedi's claim was first made in March 2012 rather than upon the filing of the Underlying Action. *Id.* ¶¶ 33-34 and Ex. C.

On June 11, 2019, Plaintiffs brought this action in Santa Clara County Superior Court. FAC ¶ 2. Plaintiffs served the state court complaint on Scottsdale on December 16, 2019. *Id.* On January 15, 2020, Scottsdale removed this action to this Court. Dkt. 1. After Scottsdale moved to dismiss the original complaint, Plaintiffs filed the FAC on February 10, 2020. The FAC asserts causes of action for: (1) breach of insurance contract — duty to defend; (2) breach of insurance contract — duty to settle; (3) breach of the implied covenant of good faith and fair dealing; and (4) violation of California Business & Professions Code § 17200 *et seq.* FAC ¶¶ 53-77. Scottsdale now seeks to dismiss all causes of action in the FAC under Rule 12(b)(6) on the grounds that Plaintiffs are not entitled to coverage under the Policy. Dkt. 16.

## II.    LEGAL STANDARD

Under Rule 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. In ruling on a motion to dismiss, the court may consider only "the complaint, materials incorporated into the complaint by reference, and matters of which the court may take judicial notice." *Metzler Inv. GmbH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). In deciding whether the plaintiff has stated a claim, the court must assume the plaintiff's allegations are true and draw all inferences in the plaintiff's favor. *Usher v. City of L.A.*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted).

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to

"more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Leave to amend must be granted unless it is absolutely clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Dep't of Corr.*, 66 F.3d 245, 248 (9th Cir. 1995).

## III. REQUEST FOR JUDICIAL NOTICE

In support of its motion to dismiss, Scottsdale has filed a request that the Court take judicial notice of the amended complaint filed in the action style *Zurvan Mahamedi v. Lex Kosowsky, et al.*, Santa Clara County Superior Court Case No. 1:15-cv-278496 (the "Mahamedi Amended Complaint"). Dkt. 17.[3]  "The court may judicially notice a fact that is not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.  Documents filed in state court proceedings are the proper subject of judicial notice. *See ReadyLink Healthcare, Inc. v. State Compensation Ins. Fund*, 754 F.3d 754, 756 n.1 (9th Cir. 2014).  Accordingly, Scottsdale's request for judicial notice is **GRANTED.**

## IV. DISCUSSION

California's substantive insurance law governs this diversity case. *See Encompass Ins. Co. v. Coast Nat'l Ins. Co.*, 764 F.3d 981, 984 (9th Cir. 2014).  Under California law, interpretation of an insurance policy and a determination of whether a policy provides coverage are questions of law to be decided by the Court. *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995), *as modified on denial of reh'g* (1995).

An insurance carrier "owes a broad duty to defend its insured against claims that create a potential for indemnity." *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1081 (1993); *see also Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 275 (1966) ("We point out that the carrier must defend a suit which *potentially* seeks damages within the coverage of the policy" (emphasis in original)).  "Implicit in this rule is the principle than the duty to defend is broader than the duty to

---

[3] The Mahamedi Amended Complaint is attached to the Request for Judicial Notice as Exhibit A. Dkt. 17-1.

4

indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded." *Horace Mann Ins.*, 4 Cal. 4th at 1081. However, the duty to defend is not unlimited; it is instead measured by the nature and kinds of risk covered by the policy. *Waller*, 11 Cal. 4th at 19.

The insured bears the burden to establish "the potential of coverage" and thus a duty to defend. *Montrose Chem. Corp. v. Super. Ct.*, 6 Cal. 4th 287, 300 (1993). Any doubts as to whether the facts establish the existence of a duty to defend must be resolved in the insured's favor. *Id.* at 299-300. Once the insured meets its burden, the insurer must establish the absence of any such potential coverage. *Id.* at 300. Thus, "the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*." *Id.* (emphasis in original); *see also MacKinnon v. Truck Ins. Exch'g*, 31 Cal. 4th 635, 648 (2003), *as modified on denial of reh'g* (1993).

"The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy." *Horace Mann Ins.*, 4 Cal. 4th at 1081. In construing insurance policy language under California law, courts "must give effect to the 'mutual intention' of the parties" at the time the contract was formed, which "is to be inferred, if possible, solely from the written provisions of the contract." *MacKinnon*, 31 Cal. 4th at 647. "[E]xclusionary clauses are interpreted narrowly against the insurer," which "cannot escape its basic duty to insure by means of an exclusionary clause that is unclear." *Id.* at 648 (citations omitted). As a result, the "burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language." *Id.* (citation omitted). "[I]n order for an exclusionary clause to effectively exclude coverage, it must be conspicuous, plain and clear." *Id.* at 639 (internal quotation marks and citation omitted).

### A.    Plaintiff's *Prima Facie* Showing of Potential Coverage

Plaintiffs have made a *prima facie* showing that the Underlying Action potentially falls within the insuring provisions of the Policy. The Policy's Insuring Clause A.1. states:

5

> The Insurer shall pay the Loss of Directors and Officers for which the Directors and Officers are not indemnified by the Company any which the Directors and Officers have become legally obligated to pay by reason of a Claim first made against the Directors and Officers during the Policy Period or, if elected, the Extended Period, and reported to the Insurer pursuant to Section E.1 herein, for any Wrongful Act taking place prior to the end of the Policy Period.

Policy at 23, A.1. Plaintiffs are Directors and Officers under the Policy. FAC ¶¶ 6-7; Policy at 24, A.4. Plaintiffs have incurred "Loss" payable under the Policy because they have incurred legal fees and other costs in defending the Underlying Action. FAC ¶ 51; Policy at 23-24, A.3 and A.7. Because Shocking declared bankruptcy before the Underlying Action was filed, it appears that the company has not and will not indemnify Plaintiffs. *See* FAC ¶ 8. The Underlying Action was filed on March 23, 2015, which was within the Extended Period under the Policy. Mahamedi Complaint at 1; Policy at 72, Endorsement No. 35; Policy at 5, Item 5. The Underlying Action involves "Wrongful Acts" because it alleges that Plaintiffs made misrepresentations, omissions, and misleading statements. Policy at 25, B.9; *see, e.g.,* Mahamedi Complaint at ¶¶ 2, 36, 43. This alleged conduct took place prior to the end of the Policy Period on August 1, 2013, with at least some of the alleged conduct taking place after the December 7, 2012 effective date of the Policy. Mahamedi Complaint at ¶¶ 21-32.

### B. Scottsdale's Attempt to Establish No Potential for Coverage

Because Plaintiffs have made a *prima facie* showing of potential coverage, Scottsdale bears the burden of establishing the absence of any such potential coverage. *See Montrose*, 6 Cal. 4th at 299-300. In its motion to dismiss the FAC, Scottsdale argues that Plaintiffs' claims for breach of the insurance contract, breach of the implied covenant of good faith and fair dealing, and violation of California Business and Professions Code § 17200 fail because Plaintiffs are not entitled to coverage under the Policy. Dkt. 16. Scottsdale argues that Plaintiffs are not entitled to coverage because (1) the Underlying Action is a Claim (as that term is defined in the Policy) first made before the Policy took effect; (2) the Underlying Action arises out of Wrongful Acts (as that term is defined in the Policy) committed prior to the effective date of the Policy; (3) the Policy excludes the claims made in the Underlying Action, which arise out of an alleged breach of contract; (4) the Underlying Action fails to allege a Loss or a Wrongful Act (as those terms are

defined in the Policy) because under California law, claims seeking the payment of a debt are uninsurable; and (5) even if Scottsdale's coverage position was incorrect, it was at least subject to a genuine dispute and thus Plaintiffs cannot prevail on their claims for bad faith, violation of Business and Professions Code § 17200, and punitive damages. *Id.* The Court addresses each argument below.

### 1. Date of Claim

The Policy at issue took effect on December 7, 2012. Policy at 4. Scottsdale argues that Mahamedi's claim was made before the effective date of the Policy because "Mahamedi purportedly wrote an email to Domokos on November 6, 2012, stating that he had incurred fees totaling about $150,000 and demanding payment of overdue invoices." Dkt. 16 at 5 (citing Mahamedi Amended Complaint ¶ 31). Plaintiffs argue that Mahamedi's November 6, 2012 email was not a claim within the meaning of the Policy because it was simply a request for payment of overdue invoices, not a written demand for damages. Dkt. 18 at 9-10.

"Claim" is defined in the Policy to include "a written demand against any Insured for monetary damages or non-monetary or injunctive relief." Policy at 23, B.1.a. "The ordinary meaning of a 'demand' as used in this context is a request for something under an assertion of right or an insistence on some course of action." *Westrec Marina Mgmt., Inc. v. Arrowood Indem. Co.*, 163 Cal. App. 4th 1387, 1392 (2008) (citing Webster's 3d New Internat. Dict. (2002) p. 598). In the context of a D&O policy, a "claim" has been defined as "the assertion of a liability of the party, demanding that the party perform some service or pay some money." *Abifadel v. Cigna Ins. Co.,* 8 Cal. App. 4th 145, 160 (1992). "A mere request for an explanation, expression of dissatisfaction, or lodging of a grievance that falls short of such an insistence is not a demand." *Westrec Marina Mgmt.*, 163 Cal. App. 4th at 1392.

Scottsdale's argument that the November 6, 2012 email from Mahamedi constitutes a "Claim" within the meaning of the policy requires the Court to evaluate the language of that email to determine whether it amounts to a demand for damages. However, the email is not in the record before this Court. Neither the original complaint nor the FAC in this action attach or quote directly from the November 6, 2012 email. Indeed, it appears from the careful wording of Scottsdale's argument, which always refers to Mahamedi's November 6, 2012 email as it is

7

described in the original and amended complaints in the Underlying Action, that Scottsdale may not have seen the November 6, 2012 email either. *See, e.g.,* Dkt. 16 at 1 ("The complaint and amended complaints in the Underlying Action reveal that before filing this lawsuit [Mahamedi] served Plaintiffs with an email on November 6, 2012 demanding payment …"); *id.* at 5 ("Mahamedi purportedly wrote an email to Domokos on November 6, 2012 …") (citing Mahamedi Amended Complaint).

Although the Court has taken judicial notice of the Mahamedi Amended Complaint, the effect of judicial notice is to establish that the amended complaint was filed, not to establish facts that could reasonably be disputed, such as the contents of the emails referred to in that amended complaint. *See United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011). The original Mahamedi Complaint stands on somewhat different footing because it is attached to the FAC in this case. *See* Dkt. 14-2. In deciding a motion to dismiss, courts may consider documents attached to the complaint, as well as unattached evidence upon which the complaint "necessarily relies" if (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document. *Corinthian Colleges*, 655 F.3d at 999. However, even accepting the allegations in Mahamedi's original and amended complaints regarding the November 6, 2012 email as true, those allegations are not sufficient for the Court to conclude that the email constituted a "Claim" within the meaning of the Policy. As described, the Mahamedi email does not indicate a threat of legal action or demand damages from Plaintiffs, as opposed to requesting payment of moneys owed under a contract between Mahamedi and Shocking. *See, e.g.,* Mahamedi Complaint ¶ 27 ("In the same November 6, 2012 email, Mr. Mahamedi requested payment of overdue invoices (which had accrued before November 6, 2012), and told Domokos that he had personally been reimbursing his firm (Mahamedi Paradice) for these costs, and that he could not continue to do so."); Mahamedi Amended Complaint at ¶ 31 (same). Certainly, not every vendor request for payment under a contract amounts to an insurance claim that must be reported to a company's insurer. Scottsdale has failed to demonstrate at this stage of the case that the November 6, 2012 email upon which its argument relies constitutes a "Claim" within the meaning of the Policy.

This conclusion is bolstered by the fact that the complaints in the Underlying Action refer

to other communications from Mahamedi to Plaintiffs beginning in March 2012 regarding Shocking's unpaid invoices. *See, e.g.,* Mahamedi Complaint ¶¶ 21-24; Mahamedi Amended Complaint ¶ 22. According to the FAC, in denying Plaintiffs tender of the claim in this case, Scottsdale took the position that Mahamedi first made a claim under the Policy "at the latest in March of 2012" when he "first demanded overdue payment." FAC ¶ 40. Yet Scottsdale now does not, for reasons unexplained, argue that those earlier communications are "Claims." Scottsdale's focus on the November 6, 2012 email might be explained by its mistaken belief that the Underlying Action was filed within a few months of that email. *See* Dkt. 16 at 6 (stating that "On March 23, 2013, Mahamedi filed the Underlying Action"). In reality, however, the Underlying Action was not filed until March 23, 2015, more than two years after Mahamedi sent his November 6, 2012 email to Plaintiff Domokos. Mahamedi Complaint at 1.[4]

Accordingly, Scottsdale has failed to establish that Mohamedi made a "Claim" before the Policy took effect, and thus its motion to dismiss the breach of contract claims on that basis is **DENIED**.

### 2. Interrelated wrongful acts

Scottsdale next argues that "[t]he Underlying Action *in its entirety* alleges, arises out of, results from, and involved **Wrongful Acts** actually or allegedly committed prior to December 7, 2012, and Wrongful Acts occurring after December 7, 2012, which are interrelated with the **Wrongful Acts** occurring prior to December 7, 2012 (i.e. failure to pay Mahamedi)." Dkt. 16 at 10 (emphasis in original). In support of this argument, Scottsdale points to the "Prior and Interrelated Wrongful Acts" exclusion in the Policy, which excludes coverage for Loss on account of any Claim "alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving: (1) any Wrongful Act actually or allegedly committed prior to 12/7/2012, or (2) any Wrongful Act occurring on or subsequent to 12/7/2012

---

[4] The Court notes that, according to the FAC, Mahamedi's November 6, 2012 email and his earlier emails referred to in the complaints in the Underlying Action were sent during the term of the Prior Policy (effective from December 7, 2011 through December 6, 2012), which had "similar" terms as the Policy that took effect on December 7, 2012. FAC at ¶¶ 13-16  In connection with the motion to dismiss, the parties do not address potential coverage under the Prior Policy if Scottsdale is correct that Mahamedi's claim was made before the effective date of the Policy that took effect in December 2012, and thus the Court does not address that issue.

which, together with a Wrongful Act occurring prior to such date, would constitute Interrelated Wrongful Acts." Policy at 60, Endorsement No. 26. Elsewhere the Policy defines "Interrelated Wrongful Acts" as "all Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of facts, circumstances, situations, events, transactions or causes." *Id.* at 17, B.9.

Plaintiffs respond that Scottsdale's argument regarding the Prior and Interrelated Wrongful Acts exclusion "*fundamentally mischaracterizes the nature of Mahamedi's claims* in describing the 'Wrongful Acts' as a 'failure to pay Mahamedi.'" Dkt. 18 at 11 (emphasis in original). According to Plaintiffs, Mahamedi's claim is not that Plaintiffs failed to pay him but that "he incurred out of pocket *tort losses* in reliance on Plaintiffs' *misstatements and omissions*" regarding Shocking's financial condition and ability to pay him. *Id.* (emphasis in original).

"The burden is on the insurer to show that wrongful acts *during* the policy period are 'related to' prior wrongful acts," and an interrelated acts exclusion is "narrowly interpreted to preserve coverage wherever possible." Croskey, *et al.*, California Practice Guide: Insurance Litigation, ¶ 7:82.3 (The Rutter Group 2019) (citing *Brown v. Amer. Int'l Group, Inc.*, 339 F. Supp. 2d 336, 346 (D. Mass. 2004) (emphasis in original)).

An examination of the complaints in the Underlying Action belies Scottsdale's assertion that the Underlying Action arises entirely out of, or is interrelated with, Wrongful Acts occurring prior to December 7, 2012. To be sure, some of the alleged statements and actions of Domokos and Kosowsky upon which Mahamedi bases the Underlying Action occurred before December 7, 2012. *See, e.g.,* Mahamedi Original Complaint at ¶¶ 21-27; Mahamedi Amended Complaint at ¶¶ 23-32. However, Mahamedi's lawsuit is also based on conduct and statements by Domokos and Kosowsky after December 7, 2012. *See, e.g.,* Mahamedi Original Complaint at ¶¶ 31-32 (alleging that Domokos instructed and induced Mahamedi to file further patent applications in January and February 2013, causing Mahamedi to advance additional filing fees); Mahamedi Amended Complaint at ¶¶ 39-40 (same).

Thus, the Underlying Action involves allegations of specific communications following the December 7, 2012 effective date of the Policy, which allegedly induced Mahamedi to make additional patent filings and incur associated costs. *Id.* Scottsdale has not demonstrated that these

10

alleged misrepresentations, which relate to issues such as Shocking's future prospects at that time, meet the definition of Interrelated Wrongful Acts within the meaning of the Policy's Prior and Interrelated Wrongful Acts exclusion. Moreover, that exclusion does not preclude all coverage for Claims involving interrelated Wrongful Acts; it states only that "Insurer shall not be liable for Loss under this Coverage Section on account of" any such Claim. Policy at 60, Endorsement No. 26. The Policy contains an "Allocation" provision that expressly contemplates that a Claim may involve Loss that is covered and Loss that is not covered. *See* Policy at 31, Endorsement No. 1. This endorsement anticipates a situation in which "the Insurer has a duty to defend a Claim under any Coverage Section in which both Loss that is covered by the applicable Coverage Section and loss which is not covered by the applicable Coverage Section is incurred." *Id.* In a "mixed action" that involves both potentially-covered claims and excluded claims, "the insurer has a duty to defend the action in its entirety prophylactically, as an obligation imposed by law in support of the policy." *Buss v. Sup. Ct.*, 16 Cal. 4th 35, 48 (1997).

Accordingly, the Court concludes that Scottsdale has failed at this stage to carry its burden of showing that the Prior and Interrelated Wrongful Acts exclusion precludes coverage, and Scottsdale's motion to dismiss the breach of contract claims on that ground is **DENIED.**

### 3. Exclusions for breach of contract and creditor claims

Scottsdale argues the Policy precludes coverage of the Underlying Action because the policy contains exclusions for breach of contract claims and claims by creditors. Dkt. 16 at 12-14. In response, Plaintiffs point out that the Underlying Action sounds in tort, not contract, and that the creditor exclusion is inapplicable or at least ambiguous. Dkt. 18 at 13-15.

#### a. Exclusion for breach of contract claims

The D&O coverage in the Policy includes the following exclusion for breach of contract claims: "Insurer shall not be liable for Loss on account of any Claim … alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the actual or alleged breach of contract or agreement; except and to the extent that Company would have been liable in the absence of such contract or agreement." Policy at 27-28, C.2.

The breach of contract exclusion states that it is applicable only to Insuring Clause A.3,

11

which relates to "Loss of the Company," not losses to the directors and officers such as the ones for which Plaintiffs seek coverage in this case. *See* Policy at 23, A.3; 27, C.2. Accordingly, by its terms the exclusion does not operate to preclude coverage of the claims against Plaintiffs.

Moreover, even if the exclusion did apply to directors and officers, Scottsdale has not shown that it applies to the particular claims in the Underlying Action in this case. The Policy does not define the terms used in the "arising out of" clause in the breach of contract exclusion. In general, "California courts have consistently given a broad interpretation to the terms 'arising out of' or 'arising from' in various kinds of insurance provisions. It is settled that this language does not import any particular standard of causation or theory of liability into an insurance policy. Rather, it broadly links a factual situation with the event creating liability, and connotes only a minimal causal connection or incidental relationship." *Medill v. Westport Ins. Corp.*, 143 Cal. App. 4th 819, 830 (2006) (citation omitted). "Such language requires the court to examine the conduct underlying the … lawsuit, instead of the legal theories attached to the conduct." *Id.* (internal quotation marks and citation omitted).

Here, the Underlying Action involves tort claims for concealment, deceit and negligent misrepresentation, not claims for breach of contract. Mahamedi Complaint at ¶¶ 34-48; Mahamedi Amended Complaint at ¶¶ 53-77. Nevertheless, Scottsdale argues that "Plaintiffs' liability to Mahamedi would not exist without the agreement for legal services," and thus the Underlying Action arises out of the same alleged Wrongful Act as alleged in Mahamedi's November 6, 2012 email. Dkt. 19 at 6. In support of this argument, Scottsdale cites *Medill*, in which a California court held that an insurer did not have a duty to defend claims against a nonprofit organization's directors and officers for breach of fiduciary duty and negligence under a D&O insurance policy that defined "loss" to exclude claims arising out of breach of contract. 143 Cal. App. 4th at 832. Specifically, the court held that the tort claims against the directors and officers, which arose after the organization defaulted on its contractual payment obligations on a series of municipal bonds, were "not independent of the breach of contract claims" for breach of loan agreements, indentures, and contractual obligations to pay on the bonds. 143 Cal. App. 4th at 829. In so holding, the court found that "the directors' and officers' potential liability *would not exist without the contracts* [the organization] entered into in connection with the issuance and

financing of the bonds," and "[a]ll of the allegations against the directors and officers arise out of duties and obligations [the organization] assumed under the bond contracts." *Id.* at 830 (emphasis added); *see also id.* at 831 ("No aspect of the underlying bond litigation would exist without the alleged breaches of the loan agreements and indentures and the contractual obligations to pay on the bonds.").

In reaching this outcome, the court in *Medill* distinguished *Church Mutual Ins. Co. v. U.S. Liability Ins. Co.*, 347 F. Supp. 2d 880 (S.D. Cal. 2004). The underlying action in *Church Mutual* included claims for breach of contract, intentional misrepresentation and concealment, negligent misrepresentation, and other torts brought by a construction contractor against a church and associated officials who had told the contractor that the church would pay amounts owed under the construction contract if the contractor changed its billing statements. *Id*. at 888-89. The district court considered whether the fraud-related claims arose out of a breach of contract and were therefore excluded from coverage pursuant to a breach of contract exclusion. In concluding that the exclusion did not apply, the district court noted that an expansive interpretation of the breach of contract exclusion was at odds with the coverage provision of the policy, which provided coverage for "Wrongful Acts" including "any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duties." *Id*. at 885. The court conducted an extensive review of similar cases and held that a narrower interpretation of the exclusionary language was "more appropriate" because exclusions are to be strictly construed against the insurer and the evisceration of coverage that would result from a broader interpretation would be contrary to the parties' apparent intent. *Id*. at 886; *see also Landmark Amer. Ins. Co. v. Navigators Ins. Co.,* No. 18-cv-05504-CRB, 2018 WL 10397995, at *7 (N.D. Cal. Dec. 14, 2018) (holding that breach of contract exclusion did not preclude coverage for underlying suit alleging that adoption agency, acting through directors and officers, failed to perform more than 500 professional services contracts, finding that application of exclusion to underlying case was "difficult to reconcile" with express coverage for "omission in the actual rendering of professional services.").

The district court in *Church Mutual* also rejected the insurer's argument that the underlying action "would not have been brought against [the church] but for [the church's] failure to pay for [the contractor's] work." *Church Mutual*, 347 F. Supp. 2d at 889. The Court held that

13

this interpretation of the underlying complaint was belied by allegations in the underlying complaint.  "Based on the complaint, [the church's] failure to perform the contract arises out of its fraudulent intent." *Id.*  Although the insurer argued at the underlying action "would not have been brought against [the church] but for [the church's] failure to pay for [the contractor's] work," the Court held that this interpretation of the contractor's complaint in the underlying action "is belied by the allegations that [the church] defrauded [the contractor] into reducing its billing statements by falsely claiming that [the contractor's] work was unsatisfactory, and that [the church] stole the core of [the contractor's] business" and that "[t]hese allegations are independent of breach of contract." *Id*.

Based on a review of *Medill* and *Church Mutual*, the Court sees the relevant question as whether the allegations in the Underlying Action in this case would stand absent the contract between Shocking and Mahamedi.  The complaints in the Underlying Action state stand-alone claims for deceit and negligent misrepresentation:  namely, Mahamedi alleges that Plaintiffs told him he would be paid to do certain tasks (including, for example, promising Mahamedi that LittleFuse, a major investor in Shocking, had agreed to make Mahamedi a secured creditor (Mahamedi Complaint ¶ 32)); that Plaintiffs knew these statements were not true; and that Mahamedi relied on Plaintiffs' statements and omissions in doing the tasks requested.  These fraud-related claims do not rely on the existence of a contract.  *See Church Mutual*, 347 F. Supp. 2d at 887 ("[T]he proper focus is on the facts alleged, rather than the theories of recovery." (citations omitted)); *see also Medill*, 143 Cal. App. 4th at 830 (the court must "examine the conduct underlying … the lawsuit, instead of the legal theories attached to the conduct.") (citations omitted)).

Therefore, the Court concludes that the fact that Plaintiffs allegedly had discussions with Mahamedi regarding his contract with Shocking—a contract to which Plaintiffs were not parties—does not mean Mahamedi's fraud-related tort claims against Plaintiffs "arise out of" a breach of that contract, even under a broad interpretation of the "arising out of" clause in the breach of contract exclusion.  This conclusion comports with the exception to the breach of contract exclusion in the Policy, which states that the exclusion applies "except and to the extent the Company would have been liable in the absence of such contract or agreement."  Policy at 27-28,

14

C.2. The Court's conclusion that Scottsdale has not shown that the exclusion for breach of contract applies claims is also consistent with the purpose behind such exclusions. "Courts have indicated that the general purpose behind a breach-of-contract exclusion is to ensure that the insured does not breach its contracts with impunity with the expectation to pass the cost off to the insurer." *Educational Impact v. Travelers Property Cas. Co. of Amer.,* No. 15-cv-04510-EMC, 2016 WL 1639548, at *11 (N.D. Cal. Apr. 26, 2016) (citation omitted). Here, the Underlying Action does not concern a contract with Plaintiffs or their breach of such a contract.

More broadly, the conclusion that the breach of contract exclusion in the Policy does not apply to the Underlying Actions also comports with California cases holding that "[t]he courts will not sanction a construction of the insurer's language that will defeat the very purpose or object of the insurance." *Gray*, 65 Cal. 2d at 278 (citation omitted); *see also Landmark Amer. Ins.*, 2018 WL 10397995, at *6-7. The Policy covers claims that Shocking's directors or officers committed a "Wrongful Act," which is defined to expressly include "actual or alleged error, omission, misleading statement, misstatement, neglect, breach of duty or act." Policy at 23, A.1.; *id.* at 25, B.9. Here, the Underlying Action asserts claims against the D&O Plaintiffs for concealment, deceit, and negligent misrepresentation. Scottsdale's interpretation of the Policy, which would exclude the duty to defend against such tort claims if the subject of the alleged omissions or misrepresentations in any way concerned a contract entered into by the company, would appear to defeat the very D&O coverage that Shocking secured.

Accordingly, Scottsdale has failed to demonstrate that the breach of contract exclusion in the Policy clearly and unmistakably excludes coverage of the Underlying Action, and therefore Scottsdale's motion to dismiss the breach of contract claims on the basis of this exclusion is **DENIED.**

### b. Exclusion for creditor claims

Scottsdale also argues that coverage is precluded by Endorsement No. 19 to the Policy, which modifies the D&O coverage to exclude "any Claim brought, or maintained by, on behalf of, in the right of, at the direction of, at the behest of, or for the benefit of any person … who is a secured or unsecured creditor of the Company." Policy at 49; Dkt. 16 at 12-14. Scottsdale bases

15

this argument in part on an assertion that "Mahamedi alleges that he is a creditor of Shocking." Dkt. 16 at 14. The only evidence offered in support of this assertion is Scottsdale's argument that "Mahamedi himself alleges Plaintiffs promised to make him a 'secured creditor' (but did not do so)." *Id.* (citing Mahamedi Complaint ¶ 32; Mahamedi Amended Complaint ¶ 40).[5] Plaintiffs argue that the creditor exclusion in the Policy is ambiguous and that Scottsdale's proffered interpretation of that exclusion is overbroad. Dkt. 18 at 14-15.

As discussed above, an insurer "cannot escape its basic duty to insure by means of an exclusionary clause that is unclear." *MacKinnon*, 31 Cal. 4th at 647. As a result, the "burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language." *Id.* "[I]n order for an exclusionary clause to effectively exclude coverage, it must be conspicuous, plain and clear." *Id.* at 639. The Policy does not define "creditor." Although the parties have not cited, and the Court has not located, any California cases analyzing a similar credit exclusion, a Louisiana district court construed an exclusion in a D&O insurance policy for "any claim or claims made against the Directors and Officers brought by or on the behalf of any creditor or debt holder of the Company…" *Louisiana/Kenwin Shops Inc.*, No. Civ. A. 97 MDL 1193, 1999 WL 1072542, at *2 (E.D. La. Nov. 24, 1999). That court concluded that the "much more reasonable interpretation of the exclusion is to find that its purpose is to exempt coverage where the claim arises in a classic debtor/creditor relationship in a corporate context—for instance where an entity has issued bonds and the bondholders are considered 'creditors' of the corporation, and the bondholders sue a director for some alleged wrongful act which resulted in the bonds being worthless." *Id.* at *6.

At best, the scope of the creditor exclusion in the Policy in this case is unclear. Accordingly, Scottsdale has failed to demonstrate that the creditor exclusion in the Policy clearly and unmistakably excludes coverage of the Underlying Action, and therefore Scottsdale's motion to dismiss the breach of contract claims on the basis of the creditor exclusion is **DENIED.**

---

[5] According to Plaintiffs' opposition to the motion to dismiss, "Mahamedi filed a proof of claim in Shocking's bankruptcy action." Dt. 18 at 15.

16

### 4. Failure to allege Loss or Wrongful Act

Scottsdale next argues that there is no coverage for the Underlying Action because it does not allege a "Loss" or "Wrongful Act" within the meaning of the Policy. Dkt. 16 at 14-16. Plaintiffs argue that these arguments fail because Scottdale again "fundamentally mischaracterizes the nature of the claims and recovery sought in the Underlying Action." Dkt. 18 at 16.

"Loss" is defined in the Policy in part to mean "damages, judgments, settlements, pre-judgment or post-judgment interest awarded by a court, and Costs, Charges and Expenses incurred by Directors and Officers …." Policy at 24, B.7. The Policy expressly excludes from the definition of "Loss" amounts that are "uninsurable under the laws pursuant to which this Policy is construed." *Id.* at 24, B.7.b. Scottsdale argues that the claims in the Underlying Action are not covered because California courts have held that alleged losses arising from failure to pay one's bills are uninsurable as a matter of law. *See* Dkt. 14-17 and cases cited therein. Scottsdale's argument on this point fails because, as discussed above, the Underlying Action is for tort claims, not claims for breach of contract.

The Policy defines a "Wrongful Act" to include "any actual or alleged error, omission, misleading statement, misstatement, neglect, breach of duty or act allegedly committed or attempted by any of the Directors and Officers, while acting in their capacity as such …" Policy at 25, B.9. Scottsdale argues that this definition excludes the failure to pay amounts owed. Dkt. 16 at 17. Again, however, the Underlying Action is a tort case for concealment, deceit, and negligent misrepresentation, not a case alleging that Plaintiffs breached a contract by failing to pay amounts owed.

Accordingly, Scottsdale has not shown that the Underlying Action does not allege a "Loss" or "Wrongful Act," and its motion to dismiss the breach of contract claims on that basis is **DENIED.**

### 5. Scottsdale's other arguments

In addition to seeking dismissal of Plaintiffs' claims for breach of contract, Scottsdale also seeks dismissal of Plaintiffs' claim for breach of the covenant of good faith and fair dealing, their claim for violation of California Business and Professions Code § 17200, and their request for punitive damages. Dkt. 16 at 17-20. Each of these arguments is premised on Scottsdale's

contention that it had no duty to defend or indemnify Plaintiffs under the Policy. *Id.*

A claim for bad faith requires the insured to show that benefits were withheld under the policy unreasonably or without proper cause. *See Waller*, 11 Cal. 4th at 35-36. The Court has already rejected Scottsdale's arguments with respect to Plaintiffs' breach of contract causes of action, and thus Plaintiffs have sufficiently alleged that benefits due under the policy were withheld. *Id.*; *see also Nordby Constr., Inc. v. Amer. Safety Indemn. Co..*, Case No. 14-CV-04074-LHK, 2015 WL 1263389, at *9 (N.D. Cal. Mar. 19, 2015). Moreover, Plaintiffs have sufficiently alleged facts supporting their claim that Scottsdale acted with conscious or reckless disregard of its obligations under the Policy in denying benefits to Plaintiffs. FAC ¶ 67-69. Accordingly, Plaintiffs have adequately plead a claim for bad faith.

Similarly, a claim for unfair competition under California Business and Professions Code § 17200 "rise[s] and fall[s] on the sufficiency of the breach of contract pleading." *EFK Investments, LLC v. Peerless Ins. Co.*, N. 13-CV-5910 YGR, 2014 WL 4802920, at *7 (N.D. Cal. Sep. 26, 2014). Because the Court has concluded that Plaintiffs' breach of contract claims are adequately plead, their Section 17200 claim survives as well.

California Civil Code § 3294 permits the recovery of punitive damages if the defendant is guilty of "oppression, fraud, or malice." "Under the federal pleading standards, a plaintiff may rely on conclusory averments of malice or fraudulent intent to plead the mental state required by § 3294." *Align Tech., Inc. v. Federal Ins. Co.*, 673 F. Supp. 2d 957, 965 (N.D. Cal. 2009) (finding sufficient allegations that insurance company "intentionally denied Plaintiff's insurance claim despite knowledge of its coverage obligations, and that it acted with an intent to injure Plaintiff"). Here, the FAC sufficiently states a request for punitive damages because it alleges that Scottsdale acted "with malice, oppression, and/or fraud, as evidenced by among other things the patently unreasonable manner in which it interpreted Policy provisions and the allegations of the Mahamedi Complaint." FAC ¶ 72.

Because Scottsdale has not shown at this stage that as a matter of law, the Policy does not provide coverage for the Underlying Action. Accordingly, Scottsdale's motion to dismiss the bad faith, Section 17200, and punitive damages claims is **DENIED.**

## V. CONCLUSION

For the reasons discussed above, Scottsdale's motion to dismiss the FAC is **DENIED.** The Court **ORDERS** as follows:

1. Scottsdale's answer to the FAC is due within **14 days** of the date of this order.
2. A Case Management Conference is scheduled for **August 18, 2020**. The parties must file a Joint Case Management Conference Statement by **August 11, 2020**.

**SO ORDERED.**

Dated: July 16, 2020

SUSAN VAN KEULEN
United States Magistrate Judge